Filed 1/27/26  P. v. Roman CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOWY OMAR ROMAN,<br><br>    Defendant and Appellant. | A170382<br><br>(San Mateo County Super. Ct.<br> No. 20-SF-001303-A) |

**INTRODUCTION**

In the middle of trial on an amended information charging defendant Jowy Omar Roman (defendant or Jowy) with numerous sex offenses against his minor child and related enhancements, and after his child and wife had testified concerning uncharged out-of-state conduct, Jowy[1] entered no contest pleas to the charged sex offenses outside the presence of the jury.  The trial proceeded on the sole remaining count for assault with a deadly weapon on a police officer, count 29.

---

    [1] Because they share the same last name, we refer to defendant and his wife by their first names, Jowy and Mayuko.  We refer to the complaining witness, who was 19 at the time of trial, as Doe to protect Doe's privacy.

The court instructed the jury that the sex offense counts (1 through 28)[2] were no longer before it and that jurors must not speculate as to the reasons. The trial resumed, with the prosecution offering testimony in support of the assault charge.

On the assault charge, the court instructed the jury it could consider evidence it had heard regarding uncharged sex offenses Jowy committed on the child before the family moved to California. Prior to Jowy's change of plea, that evidence had been admitted as propensity evidence under Evidence Code section 1108 to support the charged sex offenses. The court instructed the jury it could consider the evidence of the uncharged sex offenses for the limited purposes of determining whether Jowy harbored the motive, intent, or plan to commit the assault on a police officer.

The jury found Jowy guilty of the assault charge. Jowy appeals, arguing the trial court abused its discretion by allowing the jury to consider the evidence of the uncharged sexual offenses under Evidence Code section 1101, subdivision (b).[3]

We disagree and affirm the judgment.

---

[2] To be precise, counts 1 through 27 were the sex offense charges and count 28 charged Jowy with dissuading a witness (namely Doe) from reporting his crimes.

[3] Except as otherwise indicated, further statutory references are to the Evidence Code.

# BACKGROUND

## I.
### *Summary of Events Leading to Jowy's Arrest*

Jowy was married to Mayuko and they had three children. Their first child, Doe, was born in 2003.[4] When Doe was a child, the family moved frequently. Mayuko worked as a freelance interpreter and translator, which required her to travel a lot. From kindergarten through high school, in Connecticut, Ohio, New Jersey, and later California, Doe's father, Jowy, repeatedly sexually abused Doe, often several times a week and at some points daily. The abuse included attempted and actual sexual acts, demands for vaginal, anal and oral sex, and threats. Jowy told Doe that if they disclosed the abuse, he would kill himself or provoke police to shoot him. Doe also witnessed Jowy attempt suicide by overdose.

In January 2019, in Foster City where the family then lived, Doe disclosed Jowy's sexual abuse to Mayuko, and when Mayuko confronted Jowy he admitted the abuse, expressed romantic feelings toward Doe and threatened suicide or "suicide by cop" if they reported the abuse. After further incidents, Mayuko reported Jowy to Child and Family Services on January 17, 2020, and left the home with the children.

## II.
### *The Charges and Jowy's Initial Pleas*

The San Mateo County District Attorney charged Jowy with multiple offenses: seven counts of forcible rape of a minor over 14 years old (Pen. Code, § 261, subd. (a)(2); counts 1–7), seven counts of forcible sodomy of a

---

[4] Doe was born female but by the time of trial identified as male. Respecting his gender identity but also to avoid confusion because Doe was viewed as a female during the period the abuse occurred, we will use gender neutral pronouns.

minor over 14 years old (*id.*, § 286, subd. (c)(2)(C); counts 8–14), three counts of forcible oral copulation of a minor over 14 years old (*id.*, § 287, subd. (c)(2)(C); counts 15–17), ten counts of committing a lewd act upon a child (*id.*, § 288, subd. (c)(1); counts 18–27), one count of dissuading a witness from reporting a crime (*id.*, § 136.1, subd. (b)(1); count 28), and one count of assault on a peace officer with a deadly weapon (*id.*, § 245, subd. (c); count 29), along with various enhancements. Jowy was not charged for the out-of-state conduct, presumably because California lacked jurisdiction over those offenses.

Jowy initially pled not guilty to all charges, and the trial commenced on September 30, 2021. As we discuss further below, in the middle of his jury trial, Jowy changed his plea from not guilty to no contest for all the sex offenses and corresponding enhancements, counts 1 through 28. Trial proceeded on count 29, which we will refer to as "the assault charge," as to which Jowy continued to plead not guilty.

### III.

### *Direct Evidence Regarding the Assault Charge*

The People's primary evidence on the assault charge included testimony of four police officers[5] involved in the planning and execution of the entry, arrest and search of Jowy's home; exhibits, including photographs, a floor plan, still photos and video footage from the officers' body-worn cameras, and miscellaneous other items; and certain stipulations. The evidence supports the following facts.

On January 22, 2020, Foster City police officers executed a search warrant and an arrest warrant at Jowy's residence after his wife, Mayuko,

---

[5] These included Sergeant Travis Murray, Detective Clara Leong, Detective Jack Turner, and Officer Aziz Obaidi.

reported that he had sexually assaulted Doe, had threatened suicide if they reported his conduct and had expressed intent to provoke a "suicide by cop."

Police developed an operational plan for arresting Jowy, which they deemed necessary because he had threatened suicide, including "suicide by cop," and because of the offenses with which he would be charged. Sergeant Travis Murray, a defense-tactics and firearms instructor and member of the countywide SWAT team, developed two plans. The first was to have Mayuko text Jowy in an effort to lure him outside the family's home, where police could safely effect the arrest. This approach was considered the safer one because, by getting him out of the house, police hoped to get him away from anything dangerous he might have access to in the house. Police were also concerned that if they approached Jowy at home, he would attempt to destroy evidence, such as cellphones or computers on which images could be stored.

If the first plan failed, the second plan was for officers to knock-and-announce and attempt to bring Jowy to the door, and if he failed to respond, then to enter the apartment to contact him on their own. The concern with that approach was that if Jowy didn't come to the door, he might arm himself and hurt himself or officers.

The officers initially attempted the first plan, coordinating through Detective Leong, who communicated with Mayuko. At Leong's direction, Mayuko texted Jowy, asking him to meet her at a hotel. When Jowy responded that he needed to shower first, Sergeant Michael Greene decided to proceed with entry, concerned that he might be destroying or tampering with evidence.

Officer Obaidi, who was in uniform, performed the initial knock-and-announce at the front door, stating, "Foster City Police Department. We have a search warrant. Open the door." When no one responded, the officers

proceeded to make entry. Using a key provided by Mayuko, officers unlocked the front door but found that a chain lock remained engaged. Detective Turner then used a ram to breach the door, breaking the chain lock. Officers Turner, Obaidi, Murray, and Orlando, then entered the apartment, which was very cluttered, making additional announcements "Police" and clearing rooms.

Jowy was not in the common area, and the officers heard the sound of running water coming from the locked bathroom door. Officer Obaidi held his position at the bathroom door to prevent anyone from exiting while other rooms were cleared. Officer Turner then came to the bathroom door and announced, "We're the police, Jowy. Open the door." After Turner did this one or two times and received no response, Officer Obaidi told Turner to kick the door open, which Turner did. Turner and Obaidi entered the bathroom and found Jowy in the shower. Jowy was standing naked in the bathtub about four or five feet from Turner's torso, holding a knife upright in his right hand, at about shoulder to jawline high and pointed outward. Turner noticed cuts on Jowy's thighs and upper arm indicating he might have been harming himself. This concerned him because police had learned that Jowy indicated if he was reported he might commit suicide or attack law enforcement so they would shoot him. The cuts suggested Jowy had already used the knife and indicated to Obaidi that Jowy posed a danger to him and the other officers. Jowy's offset posture, with one foot in front of the other, made it appear that he was about to do something. It was an aggressive body stance, in which Jowy was drawing back, ready to strike or stab.

Obaidi commanded Jowy to drop the knife, saying, "Don't do it. Don't fucking do it. Drop the knife," and warned him they would tase him if he did not. Jowy failed to do so, and Officer Turner fired his taser. The taser hit

Jowy in the thigh and when his body seemed to shrink backward, Turner thought he had immobilized him. Turner moved toward Jowy to disarm and handcuff him, but when he did Jowy's right arm came toward him, and he felt something strike his left pectoral very hard. He felt what seemed like a very hard punch, a release, then another one and realized the blade of the knife was breaking against his chest. While he was thinking Jowy had been immobilized, instead Jowy had been lowering his arm, which he then swung forward and slightly upward in a "hook motion," striking Turner in the chest. Obaidi testified that the taser "didn't connect fully, so there was no incapacitation on the defendant." It looked to Turner like Jowy intentionally tried to stab him, aiming the knife right at his chest. Obaidi described Jowy's movement as "lower[ing] himself a little bit, and then with his right hand, he kind of, almost like a boxer doing a side hook— . . . that's the kind of motion he made with the knife as he thrusted it towards Officer Turner."

Almost immediately after the stabbing action, Turner heard a gunshot go off right next to his ear. Believing Turner had been stabbed, Officer Obaidi fired one gunshot striking Jowy in the stomach. Turner realized the knife had broken on his chest, Jowy had been shot and was no longer a threat, and yelled to Obaidi to "Stop," using his hand on the barrel of Obaidi's gun to lower it. He knew Jowy needed medical attention and was not yet sure if the knife had penetrated his vest or if he himself might need medical attention. Obaidi holstered his weapon. The knife strike had not penetrated Turner's vest but left bruising on his chest, beneath his left nipple.

After he was shot, Jowy fell into the bathtub and started asking, "What did I do?" Jowy did not comply with commands to exit the tub. Officers had to drag him out of the tub and grab a towel.

Officer Obaidi immediately requested "fire and medics" to respond Code 3 (as fast as possible) due to the gunshot wound. The gunshot wound was described as a through-and-through wound, meaning the bullet exited Jowy's body, and the bullet was later found in the tub. After Jowy was discharged from the hospital, he was booked into jail.

## IV.

### *Evidence of Sexual Offenses Admitted Before Jowy's Change of Pleas*

Prior to Jowy's change of pleas on the sex offense charges and the resumption of the trial on the assault charge, the jury had heard the following testimony.

### A. Uncharged Sexual Assaults

Before trial commenced, the prosecution had moved to admit Jowy's out-of-state sexual misconduct under sections 1108[6] and 1101, subdivision (b) (to demonstrate lewd and lascivious intent and a common plan or scheme as it related to the charged sexual abuse that occurred in California, and the defense sought to exclude that evidence under section 352. The People presented evidence that the defendant committed sexual offenses against Doe that were not charged in this case, specifically, sexual assaults committed before the family moved to California. The trial court admitted the evidence under both section 1101, subdivision (b) and section 1108. The trial court rejected Jowy's argument that the prejudice from hearing about the uncharged sexual assaults outweighed its probative value within the meaning of section 352. What follows is a summary of the uncharged

---

[6] Section 1108 provides, in relevant part, "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." (§ 1108, subd. (a).)

assaults and the subsequent charged assaults based on the trial testimony of Mayuko and Doe.

Doe was born June 11, 2003, and was 19 years old at the time of trial in October 2021. Although Doe was born in Connecticut, Mayuko worked as a Japanese translator, requiring the family to move frequently. From the time Doe was in kindergarten and continuing through third grade, the family lived in Ohio and Doe's father, Jowy, began sexually abusing Doe. He would smack and caress Doe's buttocks and comment on how Doe's buttocks and chest were growing larger than Mayuko's.

When the family moved back to Connecticut, Mayuko was often away on business. Doe was in fourth grade asleep in their room when Jowy tried to put his penis in Doe's vagina, causing Doe to wake up in pain. Due to Doe's young age, Jowy had trouble penetrating them, so he tried to arouse Doe by putting his mouth on Doe's vagina and then attempted to penetrate them again but was unsuccessful and "gave up." In later incidents, Jowy made Doe close their thighs and simulate having sex with him, ejaculating on Doe's stomach. Sometimes he placed one or two fingers inside Doe's vagina to "stretch me out" so he could have sex with Doe later. Jowy engaged in this type of abuse at least three times a week, and at some points daily.

The abuse apparently stopped temporarily when the family moved back to Ohio and Mayuko was home more often. When the family relocated to New Jersey, Jowy resumed the abuse. By this point, Doe knew what sex was and did not want to have sex with Jowy. However, Jowy wanted Doe to sleep downstairs with him, apart from the rest of the family, so they would be alone together at night and he could have sex with Doe. Jowy told Doe it was better for Jowy to "get rid of [his] sexual frustration" with Doe instead of someone outside the family. When Doe told him they didn't feel like having

9

sex with him, Jowy would say "it was only two minutes out of my 24-hour day" and Doe did not have to participate, meaning they only had "to lay there." The abuse occurred daily except when Doe was sick, and during menstruation Jowy demanded anal or oral sex. The anal sex, which Doe described as painful and nauseating, happened at least once a month.

While the family was still in New Jersey, Doe spoke with Jowy about telling someone what was happening. Jowy told Doe that if Doe told anyone, any form of authority, Doe should "let him know first so that he could kill himself so that he would not have to serve jail time." He told Doe, "if the police showed up for him, he would behave erratically and charge at them in the hopes that he would get shot and die." That prevented Doe from telling people.

Once, between the time Doe was in seventh grade and ninth grade, Doe witnessed Jowy attempt to commit suicide. He was drunk and sobbing about how Mayuko didn't love him and told Doe he was going to kill himself by overdosing on ibuprofen. Doe tried to stop him by taking the bottle, but he pried it out of Doe's hands. He took "very many pills along with an alcoholic beverage." Doe didn't want to be in his presence and went on a walk outside. Mayuko texted or called Doe, who went back home. Doe saw Jowy being carried out on a stretcher to an ambulance. Doe explained having conflicted feelings at the time: Doe was fed up with Jowy constantly wanting to have sex with Doe and wanted him to die, while at the same time did not want him to die because Doe still loved him as a father.

**B. Charged Sexual Assaults**

The family moved to Foster City, California, and Doe started 10th grade. Jowy's sexual abuse resumed there on a daily basis. Jowy had sex with Doe when Doe's "siblings and mother were at school or work or at

nighttime when everyone was sleeping." Jowy always locked the door to the bedroom when he had sex with Doe. Doe estimated Jowy had sex with them in their Foster City home "[a]t least 100 [times], likely more." During menstruation, Jowy again demanded anal or oral sex.

On January 31, 2019, Mayuko overheard Jowy and Doe arguing about something, and Jowy yelled to Doe, "You tell her." Doe was crying, and Mayuko asked what it was about. Doe then told her about the sexual abuse. Mayuko said it wasn't Doe's fault and that she was going to talk to Jowy about it. When Mayuko talked to Jowy, he admitted he was having sexual intercourse with Doe and explained when the abuse had started and how it had progressed. Jowy told Mayuko he had romantic feelings for Doe but promised he would never do it again. He told Mayuko that if she ever reported the abuse, "he would either commit suicide by driving a car off a bridge or by attacking a police officer so that he can get shot." He also told her that if she reported what had happened between him and Doe, Mayuko could be deported. Mayuko was concerned that once deported, she would never be granted another chance to come into this country and would not be able to see her children again.

At the end of 2019, Mayuko heard Doe and Jowy arguing again. Doe had changed the password on Doe's cellphone, which made Jowy angry. Doe looked at Mayuko "in the same way [as] when [they] originally disclosed the sexual abuse." The look was one of despair. In a conversation in the back of the hallway, Doe told Mayuko Jowy had asked Doe to do a sexual favor again. When Mayuko confronted Jowy, he told Mayuko Doe was lying, trying to break him and Mayuko up. He instructed Mayuko to keep Doe away from him and told her he would not take care of Doe anymore. After that, Jowy

11

would bring food for the rest of the family but not for Doe and would only communicate with Doe through Doe's siblings.

On January 8, 2020, Mayuko and Doe attended family therapy, and Mayuko began thinking about how she could "truly protect [Doe] and [the] other children from" Jowy. On January 17, 2020, Mayuko called Child and Family Services to report Jowy's sexual abuse. She then met with someone from that agency, who created a safety plan for her and the children. Without retrieving any of their belongings, Mayuko took the children and their pets to stay with her at a friend's house. On the same day, she went to the Foster City Police Department and was interviewed by a detective. Later she discovered that on that same day, Jowy had contacted their daughter Namine on her cellphone and asked what she was doing at the police station. Mayuko then realized Jowy had been aware since that day that they had gone to the police.

## V.
### *Mid-trial Change of Pleas*

Midway through the trial, outside the presence of the jury, and during a break in Doe's testimony, Jowy entered an open no contest plea to all the sex offenses, counts 1 through 28. As part of the plea, he waived his right to cross examine Doe. The court advised him that the People intended to use the testimony already entered for purposes of proving whatever remained after the plea was entered.

Jowy entered pleas of no contest on counts 1 through 28 and admitted the enhancements and aggravating circumstances. The pleas, entered as *People v. West/Alford* pleas, were not an admission of guilt or an admission

12

that there was a factual basis for the pleas.[7]  Instead, it was understood that the court could and did decide there was a factual basis relying on the testimony and evidence already presented and on the People's proffer of the testimony Doe would have given if the pleas had not cut short the trial on the sex offense charges.

Based on the evidence admitted prior to the pleas and on the People's proffer, the court found there was a factual basis for the pleas to counts 1 through 28, found Jowy guilty of those charges and found the enhancements and aggravating factors true.  Jowy was advised and acknowledged that this open plea included circumstances in aggravation and exposed him to the maximum term allowable under the law, which was 192 years and 8 months.

The jury was not informed of the pleas, although the court promptly instructed them that "Counts 1 through 28 no longer need to be decided in this case" and they should "not speculate about or consider in any way why you no longer need to decide those counts."  It further instructed that, "going forward, . . . the only remaining count is Count 29 with the allegation of the use of a weapon.  That's the assault on the peace officer count, so that will be the only—the only count, I should say, and issue attached to it that will ultimately be submitted to you for your decision to render a verdict on it if you can do so.  But again, as I said, don't speculate about why Counts 1 through 28 are no longer before you at this point."

---

[7]  See *People v. West* (1970) 3 Cal.3d 595 (upholding plea of nolo contendere without admitting guilt or factual basis for plea); *North Carolina v. Alford* (1970) 400 U.S. 25, 37 (same).

# VI.

### *Jury Instructions on Sexual-offense Evidence*

As we have described, the jury had already heard testimony from Doe and Mayuko describing the uncharged, and at least some of the charged, sexual abuse by the time Jowy's changed his pleas to the sexual offense charges from not guilty to no contest,[8] and after the plea, the trial proceeded on the assault charge, count 29.

Before the closing arguments, the court discussed with counsel how to instruct the jury regarding evidence of the uncharged sexual assaults. The court clarified that the evidence was no longer admissible under section 1108 as evidence of guilt on the sexual assault charges but remained admissible under section 1101, subdivision (b) relevant to the assault charge.

Ultimately, the court repeated to the jury the instruction that counts 1 through 28 "no longer need to be decided in this case" and that the jury "must not speculate about or consider in any way why." It also instructed the jury with a modified version of CALCRIM No. 375, informing the jury that it could consider the evidence the People presented "that the defendant committed other sexual assaults that were not charged in this case, specifically the alleged sexual assault-related conduct before moving to California"; it could do so "only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged offenses and acts." It instructed on the preponderance of the evidence standard. And it instructed, "If you decide that the defendant committed the uncharged offenses and acts,

---

[8] After the morning when Doe testified and described the uncharged and some of the charged abuse, the court met with the People's counsel, defense counsel and Jowy outside the presence of Doe and the jury to discuss the plea Jowy was entering on the sex offense charges. It appears that the People had not completed its questioning of Doe about the charged offenses.

you may, but are not required to, consider that evidence for the limited purpose of deciding whether, A, the defendant acted with the intent to commit Count 29; B, the defendant had a motive to commit Count 29; or, C, the defendant had a plan to commit Count 29. [¶] Do not consider this evidence for any other purpose except for the limited purposes set forth in this instruction.  Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime. [¶] If you conclude that the defendant committed the uncharged offenses and acts, that conclusion is only one factor to consider along with all the other evidence. [¶] It is not sufficient by itself to prove that the defendant is guilty of Count 29.  The People must still prove the charge beyond a reasonable doubt."

The court instructed the jury as follows on the assault charge:

"The defendant is charged in Count 29 with assault with a deadly weapon or by force likely to produce great bodily injury on a peace officer in violation of Penal Code section 245[, subdivision] (c). [¶] To prove that the defendant is guilty of this crime, the People must prove either that:

"1A.  The defendant did an act with a deadly weapon that by its nature would directly and probably result in the application of force to a person;

"OR

"1Bi.  The defendant did an act that by its nature would directly and probably result in the application of force to a person, and

"1Bii.  The force used was likely to produce great bodily injury;

"2.  The defendant did that act willfully;

"3.  When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone;

15

"4.  When the defendant acted, he had the present ability to apply force with a deadly weapon or in a manner likely to produce great bodily injury to a person;

"5.  When the defendant acted, the person assaulted was lawfully performing his duties as a peace officer;

AND

"6.  When the defendant acted, he knew, or reasonably should have known, that the person assaulted was a peace officer who was performing his duties."

As relevant here, the court further instructed the jury:

"Someone commits an act *willfully* when he does it willingly or on purpose.  It is not required that he intend to break the law, hurt someone else, or gain any advantage.

[¶] . . . [¶]

"A peace officer is not lawfully performing his duties if he is using unreasonable or excessive force in his duties."

The court went on to instruct the jury on lawful performance of duty:

"The People have the burden of proving beyond a reasonable doubt that Jack Turner was lawfully performing his duties as a peace officer.  If the People have not met this burden, you must find the defendant not guilty of Count 29.

"A peace officer is not lawfully performing is duties if he is using unreasonable or excessive force when making or attempting to make an otherwise lawful arrest.

"A peace officer may legally arrest someone on the basis of an arrest warrant.

"Special rules concern the use of force.

16

"A peace officer may use reasonable non-deadly force to arrest someone, or to overcome resistance.

"A peace officer who makes or attempts to make an arrest need not retreat or stop because the person being arrested is resisting or threatening to resist. A peace officer does not lose his right to self-defense by using objectively reasonable use of force to arrest or to overcome resistance.

[¶] . . . [¶]

"If a peace officer uses unreasonable or excessive force while arresting or attempting to arrest a person, that person may lawfully use reasonable force to defend himself.

"A person being arrested uses reasonable force when he: (1) uses that degree of force that he actually believes is reasonably necessary to protect himself from the officer's use of unreasonable or excessive force; and (2) uses no more force than a reasonable person in the same situation would believe is necessary for his protection."

## VII.

### *The People's Closing Argument*

In closing, the People argued that the January 22, 2020 incident represented the realization of Jowy's threats to commit "suicide by cop." They emphasized that the stabbing occurred the day after Mayuko and Doe disclosed the abuse to police and noted that Jowy had questioned another family member about why they had gone to the authorities.

The People recounted testimony from the officers on scene. Sergeant Travis Murray testified that officers had been informed that Jowy was violent, had made suicide-by-cop threats and might try to destroy evidence. Turner testified that officers gave repeated commands to drop the knife, that Turner warned Jowy he would use a taser, and that after deploying the taser

17

Jowy cocked his arm and stabbed directly toward Turner's chest, striking his protective vest. Obaidi testified that he fired believing Turner had been stabbed but ceased when Turner signaled him to stop.

The People argued that this sequence showed an intentional act by Jowy directed at a vital area of Turner's body, not self-defense or accident. They further argued that Jowy's motive was to avoid the conviction for his abuse of Doe, citing his prior oral and text message threats to commit suicide. They contended that the confined bathroom left officers without the option to delay, particularly given the seriousness of the charges known to police and the risk that Jowy would harm himself or others.

The prosecution also pointed to testimony from Doe and Mayuko that Jowy had threatened suicide or suicide by cop if the abuse was reported, arguing that the January 22 incident was consistent with those threats.

## VIII.

### *Defense's Closing Arguments*

In closing, defense counsel reminded the jury, "We are not here for Counts 1 through 28," and argued that the prosecution relied too heavily on that evidence. Defense counsel contended that police had devised a plan to arrest Jowy when he exited the home but instead chose to force entry, escalating the confrontation unnecessarily.

Defense counsel maintained that Jowy was in the bathroom cutting himself, saying "stop," and trying to comply when officers tased him. Jowy argued that the taser constituted excessive force, and that the stabbing of Turner was either an act of self-defense against that force or an unintentional response in panic. Jowy further asserted that officers failed to de-escalate through verbal commands before resorting to physical force.

Defense counsel urged jurors to closely examine the body-worn camera footage, arguing it did not prove guilt beyond a reasonable doubt. Counsel argued that the stabbing was not premeditated but instead the result of panic, pointing out that the text messages between Jowy and his daughter days before the incident alerted him that his family had reported him to police, but that he did not flee or go to the police station to provoke police to kill him.

## IX.
### *The Verdict and Sentence*

On October 21, 2022, the jury found Jowy guilty of count 29, assault with a deadly weapon upon a peace officer. The prosecution subsequently dismissed the aggravating circumstances alleged with that count.

On March 8, 2024, the trial court sentenced Jowy on all counts to a determinate term of 194 years in prison. This included a consecutive sentence of one-third of the mid-term, or 16 months, on count 29. Appellant timely appealed.

## DISCUSSION

## I.

### *The Trial Court Did Not Err by Allowing the Jury To Consider the Pre-California Uncharged Crimes Evidence.*

In a sense, this case is not about admission of evidence because the evidence of the pre-California sexual offenses was admitted prior to Jowy's plea to the California sexual offenses, and the jury had already heard that evidence by the time the case was narrowed to the assault-on-a-police-officer charge. After the plea, the defense argued that the court should not give the jury an instruction modeled on CALCRIM No. 375 allowing it to consider the uncharged crimes but did not renew his earlier motion seeking to sever the assault claim from the sexual offense claims. Nor does Jowy argue on appeal

19

that it was error to admit the evidence at all.  Thus, his appellate claim is not that the jury was irrevocably prejudiced by having heard the evidence but that the trial court erred in giving the instruction based on CALCRIM No. 375, that the jury could consider the pre-California sexual offense evidence for the limited purpose of assessing whether Jowy had the intent, a motive or a plan to commit assault on an officer.

Ordinarily we review challenges to jury instructions de novo, but we will not apply that standard here because both parties treated the issue as a challenge to admission of the evidence, which we review for abuse of discretion.  Jowy describes the trial court's "error" as "permit[ing] the jury to consider" the uncharged sex offense evidence, analyzes the issue under the Evidence Code provision and related case law and states that the standard of review is abuse of discretion.  Likewise, the People treat the issue as if it involved admission of evidence.  Further, in deciding how the sexual offense evidence that had been admitted before the plea should be treated, the trial court applied section 1101, subdivision (b).  It acknowledged the "unique situation" it faced "where the defendant entered pleas to Counts 1 through 28 in the middle of trial in the middle of . . . Doe's" testimony and described the issue as "exactly how the jury was going to treat that evidence."

We will address the issue in the way the parties have framed it, as one of claimed error in applying the Evidence Code, notwithstanding that ultimately the application of the Code took the form of an instruction.  That said, we evaluate the issue in the context of the procedural posture of the case when the trial court decided the evidence issue, specifically, after the uncharged crimes evidence had already been presented to the jury and the questions whether the jury could consider that evidence and for what purposes were being addressed by way of a jury instruction.

20

## A.	Evidence Code Provisions and Case Law

Generally, evidence of a person's character, including his prior conduct, is not admissible to prove his propensity to commit a crime.  Section 1101, subdivision (a) (section 1101(a)) states, "Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

Section 1101(a) does not preclude use of such evidence for purposes other than propensity.  Section 1101, subdivision (b) (section 1101(b)) states, "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act.)"

In general, evidence of uncharged crimes or conduct is relevant to prove identity, common design or plan, or intent if the charged and uncharged crimes are sufficiently similar to support a rational inference of the ultimate fact or facts for which the evidence is offered.  (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402-403 (*Ewoldt*).)  However, " 'the probativeness of other-crimes evidence on the issue of motive does not necessarily depend on similarities between the charged and uncharged crimes, so long as the offenses have a direct logical nexus.' " (*People v. Thomas* (2023) 14 Cal.5th 327, 361-362.)  "On appeal, the trial court's determination of this issue, being

21

essentially a determination of relevance, is reviewed for abuse of discretion." (*People v. Kipp* (1998) 18 Cal.4th 349, 369.)

Even if evidence of a defendant's prior uncharged offenses is relevant, it may not be admitted in contravention of " 'other policies limiting admission, such as those contained in Evidence Code section 352.' " (*Ewoldt, supra,* 7 Cal.4th at p. 404.) Under section 352, even if relevant, prior misconduct evidence must be excluded if its probative value is " 'substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' " (*Ewoldt,* at p. 404.)

" ' "The code speaks in terms of *undue* prejudice. Unless the dangers of undue prejudice, confusion, or time consumption ' "substantially outweigh" ' the probative value of relevant evidence, a section 352 objection should fail. [Citation.] ' "The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.' " [Citation.]' [Citation.] [¶] The prejudice that section 352 ' "is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." [Citations.] "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors. [Citation.]" [Citation.]' [Citation.] In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the

22

substantial likelihood the jury will use it for an illegitimate purpose.' " (*People v. Scott* (2011) 52 Cal.4th 452, 490-491.)

As with the issue of relevance under section 1101(b), we apply the abuse of discretion standard in reviewing the trial court's determination whether the undue prejudice outweighs the probative value of the evidence under section 352 applying. (See *Ewoldt*, *supra*, 7 Cal.4th at p. 405.) Under that standard, " ' "[a] trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Thomas* (2021) 64 Cal.App.5th 924, 970.)

When section 1101(b) is read together with section 352, the admissibility of uncharged-acts evidence turns on three considerations: " '(1) the materiality of the facts sought to be proved, (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring exclusion of the evidence [i.e., prejudicial effect or section 352 concern].' " (*People v. Lindberg* (2008) 45 Cal.4th 1, 22.)

## B.    Relevance of Sex Offenses to Motive and Intent

Here, the trial court allowed consideration of the uncharged sexual offense evidence for motive and planning, both of which may bear on intent, and for intent itself.

When the defendant's mental state is the primary issue in dispute, evidence bearing on motive can have significant probative value. In *People v. Phillips* (1981) 122 Cal.App.3d 69, Justice Grodin, writing for Division One of this court, explained the high probative value evidence of the defendant's motive may have in a criminal case. "While a prosecutor ordinarily need not prove motive as an element of a crime [citations], the absence of apparent

23

motive may make proof of the essential elements less persuasive." (*Id.* at p. 84.) "In the absence of a motivational hypothesis, . . . the conduct ascribed to [the defendant may be] incongruous and apparently inexplicable." (*Ibid.*) Evidence offered to show motive may "fill that gap." (*Ibid.*; accord, *People v. Davis* (2009) 46 Cal.4th 539, 604; see also *People v. Cage* (2015) 62 Cal.4th 256, 274 [although motive "was not an ultimate fact put at issue by the charges or the defense in this case, [it may nonetheless be] probative of the material issues of identity and intent, as well as premeditation and deliberation"]; *People v. Garcia* (2008) 168 Cal.App.4th 261, 275 [" ' "[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence" ' "].)

In *People v. Pertsoni* (1985) 172 Cal.App.3d 369, 375, the court upheld the admission of uncharged-crime evidence to prove the defendant's state of mind. There, the evidence showed that the defendant had previously shot at a person and slightly injured him outside the Yugoslav consulate and said he wanted to kill the victim, who he thought was part of the Yugoslav government. (*Id.* at p. 372.) When interviewed about that crime, he expressed a vehement hatred of the Yugoslav government and its representatives. (*Ibid.*) The court held this evidence was material to the defendant's charged murder of a victim who worked for the Yugoslav secret police. (*Id.* at pp. 374-375.) "[T]he evidence of the [earlier] incident was proffered to show the lengths to which appellant's passionate hatred of anyone connected with the Yugoslav government would take him." (*Id.* at p. 374.) The court held, "Proof of involvement in prior crimes is admissible if it tends logically ' "to establish any fact material for the People or to overcome any material matter sought to be proved by the defense" ' [citation] and, in

24

particular, 'to rebut a defense that a criminal act was done out of "honest fear." ' " (*Id*. at pp. 374-375.)  The "ultimate fact to be proved" in that case "was appellant's state of mind when he shot [the victim]."  (*Id*. at p. 373.)  The prosecution theory was that the killing was premeditated and with malice aforethought, whereas the appellant asserted he acted in self-defense.  "Because evidence of appellant's motive would tend to establish his state of mind, the materiality requirement was satisfied."  (*Id*. at p. 374; see also *People v. Demetrulias* (2006) 39 Cal.4th 1, 6-9, 15 [evidence of defendant's motives for robbing and assaulting one person in trial for stabbing murder of another victim admissible where defendant claimed he stabbed victim in struggle when defendant tried to collect money victim owed him]; *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1549-1551 [expert witness testimony about gang activities in jail where defendant was housed when he stabbed another inmate admitted to show gang motive and, by inference, motive of defendant who was member of gang].)

As a general matter, a defendant places in dispute all elements of the charged offense, including any intent elements, simply by pleading not guilty and proceeding to trial without conceding them.  (*Ewoldt, supra,* 7 Cal.4th at p. 400, fn.4 [" 'defendant's plea [of not guilty] does put the elements of the crime in issue for the purpose of deciding the admissibility of evidence [of uncharged misconduct], unless the defendant has taken some action to narrow the prosecution's burden of proof' "]; *People v. Daniels* (1991) 52 Cal.3d 815, 857-858 [same]; *People v. Clark* (2021) 62 Cal.App.5th 939, 959 (*Clark*).)

Here, Jowy declined to concede any elements of the assault charge including the mental state element of that offense.  Further, he affirmatively disputed the mental state element by arguing he acted in self-defense against

excessive force and out of panic rather than willfully.  His counsel sought and the trial court gave a jury instruction on that defense.  By advancing those theories, he placed willfulness—which requires proof that the defendant intentionally performed the act that resulted in the application of force—squarely at issue.  (See CALCRIM No. 860.)

Jowy argues the evidence of his uncharged sexual offenses lacked probative value because those offenses occurred years before the assault and contends his prior sexual conduct did not permit any inference that he was more likely to attack officers when faced with apprehension.  We disagree.

As to the timing, the uncharged sexual assaults spanned a nine-year period from Doe's kindergarten through ninth-grade years.  After this period, the abuse paused while the family was moving to California but then resumed in California, initiating the period covered by the charged offenses.  The uncharged crimes period ended less than a year before Jowy resumed his sexual abuse in California as Doe was beginning 10th grade.  Nor was the end of the long period of abuse Jowy committed before the family moved to California remote in time from when Mayuko reported Jowy's conduct to police and police arrested him about a year and a half after that move.[9]

Nor can we agree with Jowy's argument that his uncharged crimes are not probative of his motive in attacking Detective Turner at the time of his arrest.  Jowy began sexually abusing Doe when Doe was at a very young age and continued to abuse Doe regularly for about a decade after that before the family moved to California.  He fondled Doe's chest and buttocks.  He

---

[9]  Doe started 10th grade when the family moved to Foster City in 2018, which we infer was in August or September of that year.  Doe told Mayuko about the abuse after arguing with Jowy in January 2019.  A year later, in January 2020, after Jowy had broken his promise to stop the abuse, Mayuko reported it to police, who arrested Jowy that same month.

penetrated Doe's vagina with his fingers to "stretch it out" and later penetrated it with his penis; he attempted to orally copulate Doe and pressured Doe to orally copulate him. He sodomized Doe when Doe was menstruating. He did these things repeatedly and almost continuously throughout her childhood. When the abuse was at its worst, he penetrated her almost daily. When Doe discussed the possibility of disclosing the abuse, Jowy told her to "let him know first so that he could kill himself so that he would not have to serve jail time." He also told Doe that "if the police showed up for him, he would behave erratically and charge at them in the hopes that he would get shot and die."

Jowy's threats to Doe, and later Mayuko, were some evidence of his motive, but without knowing why Jowy made the threats, jurors would not necessarily have believed he was seriously intent on committing suicide from the threats alone. The idea that a person who committed fewer or less serious crimes would attempt to avoid prison by so drastic a means as suicide (by cop or otherwise) would seem unlikely, if not implausible. Jowy's crimes are a different story. He surely understood that his acts were serious crimes and, that if apprehended for them, he would be imprisoned for decades—and likely for the rest of his life. The number and seriousness of his offenses made his suicide and suicide-by-cop threats seem anything but idle.

In *People v. Pertsoni*, the evidence of the defendant's prior shooting and expressed hatred toward the Yugoslav government showed "the lengths to which [his] passionate hatred of anyone connected with the Yugoslav government would take him." Similarly, the evidence of Jowy's longtime sexual molestation of his child and threats of committing suicide-by-cop revealed the lengths to which he would go if he was ever arrested for that conduct.

Jowy also contends "the fact that a defendant has committed crimes in the past does not permit an inference that he is more inclined to attack the police when facing apprehension," otherwise "the prosecution would have carte blanche to admit the criminal history of any defendant who resisted efforts to apprehend him." Framed in such broad terms, the argument might resonate, but in the context of this case it does not.

Here, the evidence was highly relevant because it tended logically and by reasonable inference to show that Jowy's motive for charging at the officer was to provoke a fatal response so that he would not be tried, convicted and imprisoned for his sexual offenses, rather than, as he claimed, to defend himself from police abuse of force. Viewed in isolation, Jowy's statements and conduct—standing in the shower armed with a long knife and attempting to stab one of the armed officers who entered the bathroom—seem incomprehensible. Most people of sound mind do not engage in such suicidal behavior. The uncharged sexual-assault evidence provides necessary context for understanding Jowy's actions. It supports the People's theory that, consistent with his prior threats, Jowy assaulted Officer Turner to provoke police to kill him and thus avoid spending decades in prison for his sexual offenses. The uncharged sex offense evidence thus bore directly on a material element of the assault charge by supplying a logical explanation for conduct that would otherwise seem "incongruous and apparently inexplicable." (*People v. Phillips*, *supra*, 122 Cal.App.3d at p. 84; see also *People v. Daniels*, *supra*, 52 Cal.3d at pp. 856-859 [prior crimes admissible to explain motive for attack on police].) That motive, in turn, shows his act of stabbing the officer was willful, an element of the crime that the People had the burden to prove.

Jowy further contends the uncharged-crime evidence "lacked probative value" because "there existed no similarity between the out of state evidence

28

and the assault to support an inference that in both instances appellant possessed the same or similar intent." Again, we disagree.

As the People point out, prior crimes evidence used to show motive or intent does not always require that the prior crimes be similar to the charged crime. Our high court made clear in *People v. Thompson* (1980) 27 Cal.3d 303, that similarity is not required in all cases in which prior offenses are introduced to show intent. (*Id.* at p. 319, fn. 23; see also *People v. Scheer* (1998) 68 Cal.App.4th 1009, 1018 [" '[T]he intermediate fact of motive' may be established by evidence of 'prior dissimilar crimes' "].) Where the "theories of relevance . . . are premised on the contention that if a person acts similarly in similar situations, he probably harbors the same intent in each instance," then it makes sense to require that the defendant's prior and current offenses be similar. (See *Thompson,* at p. 319 & fn. 23.) But similarity is not required "when the similarity of offenses is irrelevant to the chain of inference sought to be drawn between the uncharged offense and the fact of intent in the charged offense." (*Id.* at p. 319, fn. 23.) The fundamental question is " 'whether the particular evidence of defendant's other offenses *here* offered is logically relevant to prove the defendant's intent *in this case*.' " (*Id.* at p. 319, fn. 22.)

The People concede that "the sex offenses that appellant committed against Doe in other states are not of a similar class to assault with a deadly weapon upon a peace officer." But they argue the defendant's prior offenses are logically relevant to prove his intent in this case: "Appellant's out-of-state sex offenses, taken together with the threats of suicide he made to [Doe], strongly establish the motive behind appellant's decision to assault Officer Turner." As we have already explained, we agree with that premise. We also agree that the relevance of the uncharged offenses to the essential

element of intent in this case does not depend on the similarity of the offenses "for the evident reason that the motive for the charged crime arises simply from the commission of the prior offense" (*People v. Scheer, supra,* 68 Cal.App.4th at p. 1018) and, in turn, established the essential element of willfulness.

Jowy relies on *Clark, supra,* 62 Cal.App.5th at page 961, contending the uncharged crimes evidence explained only the reaction that he hoped would follow the assault and not the assault itself. His reliance is misplaced.

In *Clark*, the defendant was charged with three counts of robbery with firearm enhancements and possession of a firearm by a felon. (*Clark, supra,* 62 Cal.App.5th at p. 945.) The prosecutor sought to introduce evidence of facts underlying his prior juvenile adjudication for possession of a firearm by a prohibited person, arguing it showed defendant knew possession of a firearm would lead to more custody time and a possible prison sentence and thus had a motive to get rid of the firearm used in the present case. (*Id*. at pp. 951-952.) There was evidence Clark had used a gun in the charged offense (see *id*. at p. 948), but police had never found the gun, and the defendant argued it could have been fake. (*Id*. at pp. 943-944.) The trial court agreed with the prosecution that the evidence was "relevant to motive, 'knowledge of weapons and using that firearm, one of the elements of the charge,' " and allowed the prosecutor to present the evidence. (*Id*. at pp. 953-954.) It instructed the jury it could consider the evidence for the limited purposes of deciding whether Clark knew he possessed a firearm in this case and whether he had a motive to discard the firearm but that it could not conclude from it that Clark had a bad character or was disposed to commit crime. (*Id*. at p. 956.)

The Court of Appeal agreed the evidence was material to whether the defendant knew a firearm was possessed and was real. (*Clark, supra,* 62 Cal.App.5th at pp. 958-959.) However, it rejected the prosecution's theory that the defendant's prior adjudication for possession demonstrated he had motive to dispose of the firearm used in the robbery, because discarding the firearm was not an element of the charged offenses. "Here, the prosecution's theory establishes a motive to do an act subsequent to the crime, not a motive to commit the crime itself." (*Id.* at p. 961.) "[N]othing . . . suggest[ed] that Clark's act of being in constructive possession of a firearm in a car with two other individuals in 2016 furnished Clark with a motive to possess a firearm" during the later robbery. (*Id.* at p. 960.)

*Clark* does not support Jowy's argument. Here, the evidence of Jowy's prior sexual acts of sexually molesting his child tended logically and directly to show his motive for his later act of assaulting Officer Turner when police sought to arrest him, and that *assault* was the charged offense. Jowy contends that because he was not charged with "suicide by cop," the out-of-state evidence "did not provide an explanation or cause for the assault itself, but rather for the reaction that appellant hoped would follow in response to the assault." Not so.

In *Clark*, the defendant's act of discarding the gun after the robbery was not a crime he was charged with, and his motive for discarding it was irrelevant to the charged offenses. Here, Jowy's motive for assaulting the officer was to avoid imprisonment for his sex crimes against Doe. The assault was the means by which Jowy sought to commit suicide. But the sex crimes provided the motive for both the suicidal objective *and* the assault he committed trying to achieve it. The uncharged sexual offenses and the accompanying threats were directly relevant and probative of Jowy's motive

31

to assault Officer Turner and satisfy the relevance and materiality requirements for admissibility under section 1101(b) and the trial court's accompanying limiting instruction.

Finally, Jowy further contends that the probative value the prior sexual assault evidence had, if any, was "far outweighed" by "the prejudicial impact of this evidence," which "needlessly highlighted that appellant was a sex offender" and that its admission thus violated section 352.

Preliminarily, we observe that Jowy's argument about the respective weight of the probative value and prejudice contains no meaningful discussion of the prejudicial impact of the evidence in this case, focusing almost entirely on arguments that the evidence was not probative. We have already rejected those arguments. Jowy's failure to offer more than conclusory assertions of prejudice arguably forfeited the claim that its admission violated section 352. But because sex crimes against a minor are heinous and subject those who commit them to great opprobrium, we address the issue of the relative weight of the probative value and potential prejudice on the merits. We do so keeping in mind that, as we have said, " ' "[t]he 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and *which has very little effect on the issues.*" ' " (*People v. Barrett* (2025) 17 Cal.5th 897, 955.)

Turning to that issue, we must evaluate it in the context in which it arose here, which was after the jury had already heard all the uncharged-crimes evidence and some of the charged-crimes evidence as well. Because Jowy entered a no contest plea on the sex offenses mid-trial while proceeding to contest the assault charge, the jury was already well aware of the sex

crimes evidence. Defense counsel could have moved for a new trial[10] or requested that the sex offense evidence be stricken and the jury admonished, but did neither.[11] Thus, the only way the court could address whether and for what purposes the jury could consider any of the sex offense evidence was through an instruction.

The court permitted the jury to consider only the uncharged-acts evidence arising from conduct that occurred outside California. The trial court considered the admissibility of this evidence in several contexts, including motions in limine and colloquy with counsel after Jowy entered the plea. After the plea was entered and during the trial on the remaining assault charge, the court again approached the issue and did so with care, conducting a thorough and cautious analysis before admitting the uncharged-acts evidence. The court was well aware of the nature of the evidence, the strong probative value it had and the concerns defense counsel raised about potential prejudice, and carefully limited both the scope of the admitted evidence and, through its jury instructions, the purposes for which it could be considered.

---

[10] After trial, defense counsel filed a motion for new trial, but on other grounds only.

[11] The defense objected to the court instructing the jury under CALCRIM No. 375 that it could consider the sexual offense evidence solely for the purposes of determining whether defendant had motive, intent or a plan to assault the police officer. In the alternative, he argued that if the court gave the instruction, it should instruct the jury that it had to find the People proved Jowy committed the sexual assaults of Doe beyond a reasonable doubt (rather than by a preponderance of the evidence) before it could consider those crimes. Defense counsel referred to having moved to bifurcate the sex offense crimes from the assault charge earlier in the case but did not renew that motion or otherwise request a new trial on the assault charge.

Again, the "undue prejudice" with which section 352 is concerned flows from evidence that " ' " ' "uniquely tends to evoke an emotional bias against the defendant as an individual and . . . *has very little effect on the issues*" ' " ' " in the case, evidence " ' "of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction." ' " (*People v. Scott, supra,* 52 Cal.4th at p. 491, italics added.)  Section 352 requires exclusion only when the probative value of the evidence is substantially outweighed by its prejudicial effect, that is, when the evidence " 'poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome." ' "  (*People v. Tran* (2011) 51 Cal.4th 1040, 1047.)

" '[B]ecause a motive is ordinarily the incentive for criminal behavior,' " the courts have recognized that the probative value of evidence from uncharged crimes to show motive " 'generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence.' " (*People v. Pertsoni, supra,* 172 Cal.App.3d at p. 375.)

The probative value of the uncharged sex crimes evidence to the assault charge was very high.  As addressed above, the evidence of Jowy's sexual assaults and repeated threats of suicide through self-harm or "by cop" tended logically to show his motive for committing the assault on the officer was to provoke a fatal response and thereby avoid serving a lengthy prison sentence. The probative value was that much greater because the physical assault was basically undisputed**,** and Jowy's assertion that he acted in self-defense and out of fear of the officers made his state of mind the central issue in the case. Uncharged crimes evidence may be highly relevant to motive where violent acts are claimed to have been in self-defense.  (*People v. Demetrulias, supra,*

34

39 Cal.4th at pp. 14-15; *People v. Dryden* (2021) 60 Cal.App.5th 1007, 1017.) The evidence of the uncharged sex crimes was also independent of the evidence of the charged assault, eliminating any risk that Doe's testimony as to the former was influenced by knowledge of the latter. (See *People v. Tran, supra,* 51 Cal.4th at p. 1047.)

Here, the elements required to prove the sex crimes and the assault were fundamentally different in nature, yet the offenses were inextricably intertwined. Jowy's sexual abuse of his daughter, Doe, involved exploitation of his own child, whereas the remaining charged offense involved a violent confrontation with law enforcement officers during the execution of a lawful arrest warrant for those sexual assaults. While the uncharged sexual assault evidence was probative for context and intent, as discussed above, given this stark distinction between the required elements there was minimal risk that the jury would confuse the offenses or improperly use the sexual-assault evidence to infer a disposition to commit or infer guilt on the charged assault.

The jury was aware that the People had presented evidence of "alleged sexual assault-related conduct [by Jowy] before moving to California" and that those sexual assaults "were not charged in this case." Since Mayuko first reported Jowy's sexual abuse to police after the family had moved to California, the jury could infer that Jowy had not previously been charged or punished for the pre-California sexual abuse. Further, the sexual abuse by Jowy of his child by its nature was more inflammatory than the assault on a police officer. Both of these factors can increase the risk of prejudice from evidence of uncharged acts. (See *Ewoldt, supra,* 7 Cal.4th at p. 405.)

On the other hand, the probative value of the uncharged acts evidence was very strong in this case, and the trial court specifically considered and acted to minimize the risks of prejudice, instructing the jury (1) not to

speculate about the disposition of the charged sexual offenses; (2) it could consider the uncharged crimes evidence only if the People proved those offenses by a preponderance of the evidence; (3) it could consider that evidence only for the purpose of deciding whether defendant had the intent, motive or a plan to commit the assault on the officer; (4) it could not consider it for any other purpose; and (5) it should not conclude from this evidence that Jowy had a bad character or was disposed to commit crime; (6) the uncharged sex offense evidence was only one factor to consider and was insufficient by itself to prove the defendant was guilty of the assault charge; and (7) the People had to prove the assault charge itself beyond a reasonable doubt. These limiting instructions protected against any improper use of the evidence, and we presume the jury followed them. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852 ["Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions"].)

Courts have emphasized that the risk of undue prejudice is significantly reduced when the jury is expressly instructed not to use uncharged-crime evidence to infer bad character or a disposition to commit crime. (See *People v. Fayed* (2020) 9 Cal.5th 147, 192 (*Fayed*) [evidence that defendant had been indicted in federal case, that victim intended to cooperate with federal authorities and that defendant was suspicious of her possibly incriminating him was probative of his motive for killing her, and probative value did not outweigh prejudice; court noted trial court instructed jury on limited purpose of considering that evidence in determining whether defendant had motive to commit charged crimes]; *People v. Williams* (1997) 16 Cal.4th 153, 193 (*Williams*) [trial court did not err in denying motion to exclude gang evidence that was relevant to motive and identity].)

36

As in *Fayed* and *Williams*, the trial court here issued clear limiting instructions prohibiting the jury from using the uncharged crime evidence to infer bad character or criminal propensity or, for that matter for *any* purpose other than Jowy's motive, intent or plan. As in *Fayed* and *Williams*, the risk of undue prejudice was substantially mitigated by the limiting instruction given in this case. The trial court acted well within its discretion in finding that the probative value of Jowy's out-of-state sexual-assault evidence, highly relevant to establishing his motive and intent, was not substantially outweighed by the danger of undue prejudice.

Having concluded there was no error in admission of the evidence to show motive and intent, we need not address Jowy's argument about harmless error.

## II.

### *Other Issues*

Since we have determined that the trial court did not err in admitting the uncharged sex crimes evidence to show motive and intent, we need not address whether it was error to admit that same evidence to show a plan. "Assuming, without deciding, that the jury should not have been instructed that it could consider the evidence to establish defendant's [plan]," any error in instructing it could do so was harmless. (*People v. Foster* (2010) 50 Cal.4th 1301, 1329.)

Further, for the same reasons we have concluded that Jowy's uncharged crimes evidence was properly admitted and that the trial court did not abuse its discretion in concluding its probative value was not substantially outweighed by its prejudicial effect, we likewise reject his argument that its admission deprived him of a fair trial. (See *People v.*

*Foster, supra*, 50 Cal.4th at p. 1335; *People v. Byers* (2021) 61 Cal.App.5th 447, 455.)

## DISPOSITION

The judgment is affirmed.

                    STEWART, P. J.


We concur.

MILLER, J.

DESAUTELS, J.


*People v. Roman* (A170382)